Frank L. EASTLAND, individually; Sanford L. Long, individually; William N. James, Robert H. Nash and Louie J. Sheffield, individually and as representatives of a class consisting of all past and present black salary policy employees who are represented by the Salary Policy Employee Panel of the Tennessee Valley Authority's Muscle Shoals, Alabama, Office of Agricultural and Chemical Development from January 17, 1973, until the present, Plaintiffs,

v.

S. David FREEMAN, Richard M. Freeman, and Robert N. Clement, in their official capacity as members of the Board of Directors, Tennessee Valley Authority; Salary Policy Employee Panel; Tennessee Valley Trades and Labor Council, Defendants.

Civ. A. No. 73-G-0487-NW.

United States District Court,
N. D. Alabama,
Northwestern Division.

Dec. 15, 1981.

Susan W. Reeves, Reeves & Still, Birmingham, Ala., Paul C. Saunders and Ralph McAfee, Crayath, Swaine & Moore, New York City, Richard T. Seymour and Stephen L. Spitz, Lawyer's Committee for Civ. Rights Under the Law, Washington, D. C., for plaintiffs.

Herbert S. Sanger, Jr., Justin M. Schwamm, Sr., Thomas F. Fine, A. Jackson Woodall, Jr., and Larry S. Bush, Knoxville, Tenn., for defendant TVA.

Bernard E. Bernstein, Bernstein, Susano, Stair & Cohen, Knoxville, Tenn., for defendant Salary Policy Emp. Panel.

Melvin Radowitz, Jacobs, Jacobs & Davis, Atlanta, Ga., for defendant Tennessee Valley Trades & Labor Council.

## MEMORANDUM OPINION

GUIN, District Judge.

This cause came before the court after a bench trial held from August 11 through 22, 1980, in Florence, Alabama, and from September 29 through October 23, 1980, in Birmingham, Alabama. The bench trial involved individual claims of plaintiffs Frank L. Eastland and Sanford L. Long, and the class action, which is the subject of this memorandum opinion. The claims of Mr. Eastland and Mr. Long are considered in separate memorandum opinions. The class representatives are William N. James, Robert H. Nash, and Louis J. Sheffield. Mr. Long is not a member of the class; however, since Mr. Eastland was briefly employed as a salary policy employee by one of the organizations within the Office of Agricultural and Chemical Development (OACD), he is a class member. The defendants consist of the members of the Tennessee Valley Authority Board of Directors in their official capacity, S. David Freeman, Richard M. Freeman, and Robert N. Clem-

ent, who will be referred to as "TVA;" the Salary Policy Employee Panel (Panel), which represents essentially TVA "white collar" employees exclusive of those on the "M" or management pay schedule; and the Tennessee Valley Trades and Labor Council (Council), which represents essentially TVA "blue collar" employees. Since only a "white collar" class is certified, the Council has not played an active role in this litigation after the entry of the class certification order.

The procedural history of this case is quite lengthy. The original complaint was filed on May 21, 1973, and was substantially amended on October 9, 1973. The court originally disposed of the case on motion for summary judgment by the TVA defendants. The United States Court of Appeals for the Fifth Circuit reversed in part and remanded for further proceedings, and the Supreme Court declined to review that decision. *Eastland v. Tennessee Valley Authority*, 398 F.Supp. 541 (N.D.Ala.1974), *supplemented* 9 EPD ¶ 10,213 (N.D.Ala.1975), *supplemented* 10 EPD ¶ 10,362 (N.D.Ala.1975), *aff'd in part, rev'd in part*, 553 F.2d 364 (5th Cir. 1977), *cert. denied* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed. 479 (1977). The Fifth Circuit specifically upheld this court's grant of summary judgment against nine of the twelve plaintiffs. All but one of those nine were employees of TVA's Office of Agricultural and Chemical Development (OACD) at Muscle Shoals, Alabama. The ninth was an employee of TVA's Division of Power Production who was seeking an apprentice job at OACD. The Fifth Circuit stated that these individuals could seek to intervene as members of a certified class; none did so. After remand, additional claims of certain of the named plaintiffs were added by supplemental amendments, and another individual, Sanford L. Long, sought to intervene.

At the court's direction, the parties filed briefs, affidavits, and exhibits on the question of class certification, in lieu of a hearing, on February 20, 1980. The court subsequently certified a class consisting of all past and present black salary policy employees who are represented by the Salary Poli-

cy Employee Panel of the Tennessee Valley Authority's Muscle Shoals, Alabama, Office of Agricultural and Chemical Development (OACD), from January 17, 1973, until the present. *Eastland v. Tennessee Valley Authority*, 23 EPD ¶ 31,166 (N.D.Ala.1980). With respect to back pay claims, the court fixed the applicable time limit as two years prior to the date on which any plaintiff first contacted a TVA EEO counselor.

At the initial trial session in Florence, the court dismissed the actions of Mr. Eastland and Mr. Long on the merits with respect to the Panel only. By agreement of the Panel and the plaintiffs, the Panel was dismissed with the stipulation that it would be bound by any decision on the merits. Order and Stipulation of August 18, 1980.

The class action alleges unlawful and pervasive discrimination against blacks in promotion, transfer, training, assignment and other conditions of employment by the Tennessee Valley Authority in violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972. The court has subject matter jurisdiction over this action under 42 U.S.C. § 2000e–16(c).

■ Although the class description does not allege discrimination against blacks as a result of reductions in force (RIF), evidence was presented concerning such discrimination in connection with one of the class member's claims, the claim of Mr. James. However, the court finds that there was no proof of RIFs impacting blacks in a discriminatory manner.

■ There was no proof of transfers impacting blacks in a discriminatory manner.

■ Proof of discrimination in training was limited to the complaints of individual class members, discussed below. The complaints may be summarized as unpersuasive, even as petty and indicating supersensitivity to the point of near paranoia. Improvement on the part of both plaintiffs and defendants at OACD in communicating with one another is desirable; however, the evidence shows that TVA is aware of this problem and is working on it. The issues in this case do not include mere difficulties in communication, but involve allegations of racial prejudice. There was no racial prejudice in training.

■ There was no evidence presented supporting discrimination in assignment (not to be equated with "initial assignment"), except for those few such complaints, all adequately explained by the evidence, discussed in this court's review hereinafter of the testimony of the class members. Certainly, even if all the complaints as to assignment were taken as valid, they fall short of proof of unlawful or pervasive discrimination in assignment of plaintiffs at OACD.

■ The catchall category of "other conditions of employment" as an issue is, for all practical purposes, unsupported by any real attempt at proof. Consequently, the only evidence worthy of review is that on the issue of promotion.

Tennessee Valley Authority (TVA) was created by the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831–831dd (1976), and is an agency of the United States Government. TVA is currently organized administratively into eight offices, with 27 constituent divisions. The office involved in the class action and Mr. Long's claim is the Office of Agricultural and Chemical Development (OACD). Mr. Eastland's claim involved the former Division of Property and Supply, now the Division of Property and Services, Office of Management Services.

TVA employees can be divided into two broad categories: white collar and blue collar. The employees generally represented by the Salary Employee Panel are white collar employees not in management positions. These employees include those on the SA, SB, SD, SE, SF, and SG schedules. Employees on the M (or management) schedule are not represented by the Salary Policy Employee Panel and are hence not part of the class before this court. (See Orders of October 31, 1979, and July 8, 1980, as amended July 10, 1980.) The TVA white collar positions represented by the Salary Policy Employee Panel are:

the SA (administrative) schedule

the SB (clerical) schedule

the SD (engineering and scientific) schedule

the SE (aides and technicians) schedule

the SF (custodial) schedule

the SG (public safety) schedule

Each of the above schedules is further divided into grade levels and steps within grade levels.

Individuals move from lower to higher grades within schedules or on to different schedules in one of two ways. One way involves the filling of a vacant position by promotion or lateral transfer. The position may have been vacated by a previous incumbent or be one newly created. Rules for selecting the person to be promoted or transferred are found in the Agreement with the Salary Policy Panel. The Agreement generally provides that it is TVA's policy to promote or transfer present employees; outside candidates may be selected if their qualifications are shown to be superior to those of employee candidates. Vacant positions may not be filled until the position has been announced and employees have been given the opportunity to apply for the announced vacancy. Exceptions to this rule include temporary positions for less than one year, positions in the two lowest grades of schedules SB, SE, and SF, and positions in the two lowest levels of schedules SA and SD. However, current employees may indicate interest and be considered for any of these "excepted" positions under TVA's supplementary vacancy announcement procedure. It is clear to this court that the class members benefit from the "employee preference" policy at TVA.

Movement between grades and schedules under this announcement procedure is generally termed "promotion." An employee's schedule or grade may be also changed by "reclassification," which is a different procedure. The court finds that upward movement within the various pay schedules at OACD is largely by reclassification of positions as opposed to filling positions under the announcement procedures.

It is noted by the court that although the court allowed plaintiffs to pursue the question of selection into the M schedule from the salary policy ranks, which usually occurs from an SD–4 level, no evidence was presented involving OACD. In addition, no evidence was presented concerning alleged blocked progression into the SD–4 position.

■ After a full trial, this court, pursuant to the mandate of the Fifth Circuit to continually reevaluate the adequacy of representation in (b)(2) class actions, decertifies the class action as to the SA schedule because the named plaintiffs lack a sufficient nexus with the class as to the SA schedule. *Grigsby v. North Miss. Medical Center, Inc.,* 586 F.2d 457 (5th Cir. 1978). *See also, Walker v. Jim Dandy Co.,* 638 F.2d 1330 (5th Cir. 1981); *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419, 423 (5th Cir. 1980); *Scott v. City of Anniston,* 90 F.R.D. 267 (N.D.Ala.1981). There is no class representative for this schedule; there was no evidence presented that anyone who is a class member or even *any* black ever applied for a job on the SA schedule or was qualified for such a job. However, as will be seen, this decertification has no effect on the outcome. The court would reach the same result as to the class claims even without this partial decertification.

Furthermore, this court excludes any claims by plaintiffs regarding "initial assignment" since the claims are applicant claims and as such have been excluded by the mandate from the Fifth Circuit.

The class representatives are William N. James, Robert H. Nash, and Louie J. Sheffield. Much of the testimony before the court involved the claims of these class representatives.

Mr. James has been employed by TVA in various capacities since 1948. At the present he is an SF–1 janitor in OACD's Division of Chemical Operations, and the only class member from Chemical Operations who testified at the trial. He has been a party to this suit since October 1973. His claims revolve around a reduction in grade he received as a result of a reduction in force (RIF) at OACD in 1976. Mr.

James' allegations involve, to a large extent, claims of intentional reprisal related to the bathhouses.

The SF schedule is the custodial schedule. In 1950, Mr. James became a janitor in the predecessor organization of the Division of Chemical Development. On January 26, 1958, he became an SF–2, bathhouse custodian, a position he retained without interruption until June 2, 1976. Using TVA's current terminology, this was a move from an SF–1 to SF–2, and was a reclassification of Mr. James' position to reflect a higher level of duties and responsibilities as opposed to a promotion where, in the normal course, a new or vacant position is filled competitively. This reclassification occurred after a request by Mr. James for a reclassification hearing. According to TVA, the reclassification occurred because more than 40 percent of Mr. James' time was spent keeping records on and assigning the approximately 2,000 lockers in the various bathhouses at the Division of Chemical Operations. These duties were judged to be of a higher level than SF–1 janitor duties, and so supported the higher classification.

The integration of the bathhouses at the Division of Chemical Operations took place in 1964. It must be noted by the court, that the majority of Mr. James' testimony in this cause and in his administrative complaint dealt with his allegations that OACD permitted the existence of de facto segregated bathhouse facilities for the employees at Chemical Operations. Although the court finds the allegations to be without merit, in order to clear the record the court will devote more attention to Mr. James' bathhouses than the facts strictly warrant.

The record reflects that there have been bathhouses at Chemical Operations since TVA was created in 1933. The bathhouses were provided for the convenience of the work force and were equipped with lockers, restrooms, showers, and arrangements for drying work clothes. Additional restroom and wash basin facilities were provided at various locations in the work areas, along with tool and storage lockers.

In 1964, four bathhouses were in use. The largest was bathhouse number three, located in the central area of the Chemical Operations plant area. Number three was divided into an east and west end, both of which were in use in 1964. In 1964, number three was restricted to whites only, old number one was used only by blacks, and number five was used by both races, but with a partition separating the races.

Mr. James testified that the white bathhouses were better maintained and more comfortable than the black facilities. OACD management integrated the bathhouses in 1964 under a plan agreed to by management and the unions, with the advice and guidance of Walter R. Goldston, a black employee who had considerable experience in such matters in the local communities. The plan of integration was implemented at a time when Mr. James was on a vacation from his position of bathhouse custodian. The partition was torn down in number five; number one was closed; and number three was being integrated. At this point, Mr. James returned from vacation and objected to the method of integration of the bathhouses. On his own initiative, Mr. James started assigning lockers to blacks in number three without regard to shift or crew membership. Mr. James' testimony that he started his method of integration because the blacks were being crowded into only one area of number three is contradicted by all other testimony presented on this point.

Mr. James' behavior upset the management and union representatives because it disturbed the employees. Mr. James was sent home, but was kept on pay status. Another janitor, James Brown, a black, was temporarily assigned to Mr. James' duties until the initial integration of number three was complete. No disciplinary action was ever taken against Mr. James, and he lost no pay over his disobedience. Upon his return to work, he was temporarily assigned to other duties until the initial integration process was complete, whereupon he resumed his full duties as bathhouse custodian.

During the time period of 1964 to 1973, bathhouse use decreased. This decrease was due to a combination of a shrinking work force at Chemical Operations resulting from a series of RIF's and a change in working conditions and personal habits, which were described in some detail by Mr. Hester. Bathhouse number five was closed down, and three new bathhouses were built.

In 1973, OACD management decided to contract out the maintenance work at Chemical Operations because of the higher labor costs associated with such work by Chemical Operations' own forces. This change in policy led to a sizeable reduction in force (RIF), which affected the bathhouse use. Number two was turned over to the work force of the maintenance contractor, and Chemical Operations' management initially decided to shut down number three and keep only number four open to meet the bathhouse needs of the reduced work force, fewer of whom were using the facilities in any event.

Because of these changes, the position of bathhouse custodian, SF–2, in which Mr. James served, was originally planned to be eliminated in 1973. However, he was offered continued employment as a janitor at level SF–1.

The employees, both white and black, requested management to keep bathhouse number three open. Due to the preference of the employees, management decided to keep number three open, and close number one and number four. A result of this decision was the cancellation of Mr. James' RIF on August 21, 1973.

Mr. James contacted the TVA EEO counselor on August 3, 1973, prior to the cancellation of his RIF. His formal EEO complaint was filed on August 22, and alleged that OACD's decision to close number three and eliminate his position as bathhouse custodian as a result was taken in reprisal for his civil rights activities. In addition, he claimed that the building and ground supervisor, a black M schedule employee, had put an unfavorable and unjustified memorandum in his personnel file in order to build a false record of unsatisfactory work performance and thus to lay the groundwork for his demotion or termination, and that his supervisor was not affording him his rights under the law.

TVA's director of EEO rejected the complaint on September 7, 1973. He ruled that part of the complaint had become moot due to the intervening cancellation of the RIF. The issue of Mr. James' supervision was rejected as untimely since it sought to reopen Mr. James' 1969 EEO complaint about the selection of two other black men to be the building and ground supervisor, Braska Coffey, and janitor foreman, James Brown, over him. This complaint had been decided adversely to Mr. James, and his subsequent suit in this court was dismissed with prejudice. The rest of the complaint was rejected as beyond the purview of the EEO complaint procedure as presented, since it sought to review the rejection of Mr. James' union grievance over the memorandum he received from Mr. Coffey. The grievance had been rejected for untimeliness. The TVA decision instructed Mr. James how to frame this last issue so that it would come within the purview of the EEO procedure, but the record fails to show any effort by Mr. James to follow this advice. This decision formed the basis for Mr. James' original allegations in the October 1973 amended complaint in this action.

At trial, the facts surrounding the 1973 complaint were addressed by Mr. James only as additional background to the 1976 EEO complaint. The court notes that there is nothing in the record to support a finding that the TVA decision was erroneous. The issues arising from Mr. James' 1969 EEO complaint were moot administratively and judicially by 1973, and his RIF had been cancelled. Mr. James did not properly invoke the administrative complaint process with regard to Mr. Coffey's memorandum to him, and failed to take advantage properly of the director of EEO's demonstration of how to raise the issue of management's rejection of his grievance. The record is undisputed that Mr. James did not follow any of the available procedures to review the memorandum from his supervisor. In

1976, Chemical Operations experienced a major RIF with the final closing down of the entire phosphate branch. Half of the Chemical Operations' employees were terminated through the RIF.

The position of bathhouse custodian was eliminated in the 1976 RIF. Bathhouse number three was closed. However, Mr. James was retained as a janitor at SF–1. Mr. James continues to hold this position.

Mr. James filed a formal EEO complaint on March 31, 1976. He alleged that he had been discriminated against in the selection of Harry Nash, a white male, for the position of building and ground supervisor, the M–1 position previously held by Mr. Coffey. Mr. James also alleged that he and other black members of the building and ground unit had been discriminated against by the lack of promotional opportunities for them. Finally, he alleged that his demotion to SF–1 in the RIF was due to racial discrimination. He alleged that Chemical Operations would not have been able to reduce the number of bathhouses it maintained if it had not tolerated segregated "makeshift" bathhouses elsewhere in the plant.

TVA's director of EEO issued a decision on December 22, 1976, finding no discrimination in Mr. James' claims. The decision noted that the M schedule position of building and ground supervisor had been eliminated in the 1976 RIF and that Harry Nash, an SD schedule chemical engineer, assumed minor supervisory duties over the janitors, with the principal supervision being assigned to the black SF–3 janitor foreman, Mr. Brown. The RIF was found not to be discriminatory; it affected a major portion of Chemical Operations and impacted both white and black employees. This decision was the basis for Mr. James' January 18, 1977, supplemental amended complaint in this suit.

It is clear to the court that the series of RIF's which the Chemical Operations underwent from 1969 to 1976 would clearly limit promotional opportunities for all races. The opportunities for advancement in the janitorial work at Chemical Operations were severely limited. Testimony at trial revealed that a large number of individuals took advantage of other opportunities to move into jobs with greater potential for advancement. Mr. James was offered such advancement opportunities through the years and turned them down for personal reasons, such as dislike of work on other than the day shift, and a desire not to conflict with non-TVA employment. Jobs such as chemical plant operators required rotating shifts. Mr. James' allegation about Harry Nash's "selection" as supervisor of the building and ground unit is completely erroneous. This position was filled by a black man, Mr. Coffey, prior to the 1976 RIF. The position was eliminated in that RIF; Mr. Coffey retired; and the position has not been recreated. Prior to the 1976 RIF, Mr. Nash was an SD–4 engineer; he was an SD–4 engineer after the RIF; he is still an SD–4 engineer. Due to the elimination of Mr. Coffey's position, the primary supervision of the remaining janitors was assigned to the incumbent SF–3 foreman, Mr. Brown, himself a black, and Harry Nash was given the very minor responsibility of serving as Mr. Brown's superior. Thus, Mr. James is attacking an alleged promotion that was never made.

■ As far as Mr. James' allegation that his position at SF–2 would not have been reduced in the 1976 RIF if the OACD had suppressed the purported makeshift bathhouse facilities, this court is of the opinion that no such facilities existed. At the time of the 1976 RIF, Mr. James was no longer performing duties above the SF–1 level for at least 40 percent of his time. Furthermore, even if all the employees present after 1976 had used the bathhouse facilities, it appears that there would not have been sufficient work to support Mr. James' position at SF–2. The division shrank from having 2,000 lockers in 1958 to 350 in 1976.

Thus, Mr. James does not appear to have a valid claim on any of his allegations before this court.

The next claim of a class representative considered by the court is that of Robert H. Nash. Mr. Nash has been employed by TVA since 1962 and by the Division of

Chemical Development since 1965. He has been a chemical laboratory analyst since 1965. He was reclassified from SE–2 to SE–3 on January 2, 1966; from SE–3 to SE–4 on July 26, 1970; and from SE–4 to SE–5, which is his present grade, on May 9, 1976. He originally joined this suit in October 1973, but summary judgment against him was entered and affirmed on the claim he raised at that point. His individual claim at issue, added by an amendment, concerns events in 1973 and 1974. It involves his dissatisfaction with the service review he received on April 1, 1974, for the period from June 1, 1973, to April 1, 1974, and his belief that his position was not properly classified. Reprisal is an element of his allegations.

The facts of Mr. Nash's allegations are relatively simple. In May 1973 he was an SE–4 chemical laboratory analyst working for John F. McCullough, an M–5 research chemist, in what at that time was termed the Fundamental Research Branch. Mr. McCullough had recommended that Mr. Nash's position be reclassified from SE–3 to SE–4 in 1970.

Mr. McCullough was subsequently promoted. At this time he decided to reassign Mr. Nash to assist Richard Sheridan, who was and is an SD–4 research chemist. Mr. McCullough made this assignment due to Mr. Sheridan's current projects and need for some assistance from a technician.

Mr. Nash objected to the assignment. He was concerned about working for a superior who was not on the M schedule, and he alleged that Mr. Sheridan had a negative attitude toward him as a black man. The court finds that Mr. Nash's allegations about Mr. Sheridan's alleged racism were unfounded based on the testimony presented at trial. It appears that Mr. Nash's beliefs about Mr. Sheridan's alleged animus adversely affected his work performance during the early part of his assignment to Mr. Sheridan. His productivity was below that of his normal capacity. However, after the period of initial difficulty, his level of performance became satisfactory. At a later time, Mr. McCullough counseled Mr.

Nash on the matter of his productivity and some problems with his tardiness.

Mr. Nash became dissatisfied with what he perceived to be his lack of progress as a chemical laboratory analyst. Because he believed that he was performing work at a level higher than SE–4, he contacted the EEO counselor on January 21, 1974; the counselor recommended that Mr. Nash be given a service review. It is this service review which is the subject of Mr. Nash's complaint. In this review, Mr. Nash was rated by Mr. Sheridan for the period of June 19, 1973, through June 1, 1974. The review reflected fully adequate performance in four work performance areas, adequate performance on other elements of service, and adequate or better for his total service. Mr. Sheridan also included a comment which stated as follows:

Mr. Nash does careful and reliable work; however, during the earlier part of the review period, his work output was below his full capacity. After informal counseling by his supervisor, there has been a marked improvement in his work output and his general attitude that demonstrates his capability to perform at a more than satisfactory level.

Mr. Nash objects to the criticism of his productivity, and filed his formal EEO complaint on April 29, 1974. He alleges that the service review is inaccurate and that he was underclassified, as a reprisal for his EEO activities and on the basis of his race. TVA's director of EEO found no discrimination or reprisal in his decision issued on December 18, 1974. However, he directed management to improve communications with Mr. Nash, to conduct a classification review of his position, and to provide him with some measure of accomplishment so that he could determine his progress towards SE–5. A classification review was performed by an expert from TVA's Division of Personnel, who found that the job was properly classified. This evaluation was never challenged.

Mr. Nash appealed the decision by the director of EEO to the United States Civil Service Commission's Appeals Review

Board, which affirmed the director's decision in all respects on August 19, 1975.

This court finds that Mr. Nash has no valid claim concerning the service review. The question of the proper classification of Mr. Nash's position must also be resolved against him. Mr. Nash's comparison of his own job duties to those of Raymond Thrasher, an SE–7, and Lucian Kendrick, an SE–6, is unsupported by the evidence. Mr. Nash's analytical procedures appear to have been quite routine.

The evidence is also not sufficient to show any reprisal motivation, and Mr. Nash has failed to show the court any reason to disbelieve Mr. McCullough's flat denial that he criticized Mr. Nash for his EEO activities.

In June 1974, Mr. Nash was placed under the supervision of John Kohler, a research chemist in Mr. McCullough's group. Mr. McCullough had decided that Mr. Kohler needed more help than Mr. Sheridan and felt that it might be a good idea to separate Mr. Nash and Mr. Sheridan due to the pending EEO complaint. Mr. Kohler is Mr. Nash's supervisor at the present time.

In 1976 Mr. Nash's position was reclassified to SE–5 due to a decreased level of supervision required for Mr. Nash and due to the increase in complexity of his work, which had moved into the research area from analytical assignments.

The court notes with interest that Mr. Nash, with OACD financial support, chose to obtain an MBA degree rather than upgrade his knowledge of chemistry, and has turned down an M-schedule position on the EEO staff in Chattanooga.

The court finds that Mr. Nash has no valid claim under his complaint herein.

The remaining class representative is Louie J. Sheffield. Mr. Sheffield has been employed by OACD since 1952. From 1957 until 1963 he was a chemical laboratory analyst. On February 3, 1963, his position was reclassified from SE–4 to SD–1, as an analytical chemist. His position was reclassified to SD–2 on April 26, 1964; and to SD–3, his present grade, on August 5, 1973.

Mr. Sheffield has a BS degree in chemistry from North Carolina A & T College; at the time of Mr. Sheffield's graduation, the chemistry curriculum at North Carolina A & T College was not accredited by the American Chemical Society. He has been a party to this action since October 1973. He alleges a racially based denial of reclassification of his chemist position during the period from November 1972 until August 1973. He also alleges that he was discriminated against in day-to-day work assignments, by denials of higher level work which would have supported an earlier reclassification of his position.

Chemical Development and OACD require a BS degree in chemistry from an American Chemical Society approved curriculum for initial hiring to a professional chemist position (on the SD schedule). Recipients of non-ACS degrees are generally eligible for consideration for positions on the SE (subprofessional) schedule. Individuals with non-ACS degrees are considered for SD positions if their schools have met all of the substantive requirements for ACS accreditation, or if they have had substantial related work experience. The evidence before this court shows that OACD has applied this policy equally to blacks and whites. Blacks and whites with ACS degrees have been hired into SD schedules (with the exception of at least one white with an ACS degree who was hired into an SE position), while blacks and whites without ACS degrees have started in SE positions, and blacks and whites from schools with the equivalent of ACS accreditation (Southern University and the University of North Alabama) have been hired into SD positions. Current employees on the SE schedule can progress to the SD schedule by upgrading their skills, abilities, and knowledge, their work experience or additional education and training, and then assuming duties and responsibilities at a higher level. Mr. Sheffield was a beneficiary of this route to professional ranks, as were other employees.

The lab in which Mr. Sheffield worked had no real control over the level of its

work. This lab had to work on analysis of whatever samples were sent to it by other organizations with OACD. From the testimony of Mr. Sheffield's supervisors before the court, it appears that Mr. Sheffield was assigned work on the basis of his abilities and what was available in the lab at the time, and not on his race.

On the issue of the delay in the reclassification of Mr. Sheffield's position from SD–2 to SD–3 during the period of late 1972 through the middle of 1973, the court must note that the OACD was laboring under two separate and major personnel restrictions imposed by the Executive Branch. One was an absolute ceiling on the number of employees in the organization. The other was a ceiling on average grade level, which restricted moving an employee into a higher grade position unless the move was to replace a former employee. Each organization within TVA was assigned its own employment ceiling and average grade level by top TVA management through the Division of Personnel. In their concern that employees whose positions were overdue for reclassification might look elsewhere for work, Chemical Development management presented a list of top-priority individuals to Mr. Duggins in the summer of 1972, and he was able to secure limited relief from the controls from the Division of Personnel, as long as the reclassifications were done slowly. Mr. Sheffield was not on this priority list submitted in the summer of 1972.

Mr. Duncan, Mr. Sheffield's supervisor, did not recommend that Mr. Sheffield's position be reclassified until late November 1972, due to the fact that Mr. Sheffield had not been performing work on the SD–3 level until that time. Mr. Duncan's recommendation for reclassification included the names of six people in the general analytical lab. Before any paper work was started on any of these six employees, the President ordered a freeze on promotions in federal employment on December 11, 1972. Since reclassifications are not formal promotions, this restriction did not have a firm effect on Mr. Sheffield's reclassification. However, the reclassification of all six lab employees was stayed until after TVA submitted its management plan to end the "freeze" in March 1973. There is no basis to believe that Mr. Sheffield was singled out for different treatment because of his race. The average grade controls, plus the freeze implemented by the President, appeared to have had a psychological effect on the minds of management.

The court finds that progression in general in this lab was not guaranteed. Mr. Sheffield himself testified about three white employees who retired as SD–2's. Furthermore, Mr. Sheffield has never taken advantage of available OACD financial support to take additional course work in his field or in any other field, unlike so many of plaintiffs' other witnesses and other class members. Mr. Sheffield has no valid claim herein.

The plaintiffs failed to show by testimony at trial or by other evidence presented to the court a single valid claim of any black who should have been promoted and was not. However, the court will briefly discuss the claims of the other class members who testified at trial.

Mr. Claude Eubanks is a black class member who was initially hired by OACD as a scientific cooperative student in 1967. After spending some time in the military, Mr. Eubanks was hired in 1971 as an SD–1 analytical chemist in the general analytical laboratory in Chemical Development, the same unit where Mr. Sheffield was employed. He has progressed to an SD–3 through reclassification of his position, and is currently attending the University of Alabama in Tuscaloosa as a candidate for an MS degree in chemical engineering. OACD is paying his tuition, along with full salary and benefits. He has also been reimbursed by OACD for other course work.

Mr. Eubanks alleges two claims in connection with the comparison of his treatment with that of Charles Gilbert, one of his white peers in the lab, who was hired at the SD–1 level. Mr. Eubanks alleges that Mr. Gilbert was hired at a within-grade salary one step higher than himself. However, this treatment was explained by a

personnel officer at OACD, Cathy Isom, who testified that Mr. Gilbert's higher grade step was due to the fact that he had been a cooperative student at TVA and had therefore worked for OACD for a longer period of time when he was hired after graduation.

Mr. Eubanks also alleges that Mr. Gilbert has been exposed to more analytical procedures. However, the two men's promotions occurred at approximately the same time. Mr. Eubanks' concerns appear imaginary due to the identical progression of the two men to date.

Mr. Wendell Plain is a class member who was hired by OACD as an SD-2 research chemist in 1975. He has since progressed to an SD-3. He has an MS degree in chemistry. At the present time he is pursuing an MS degree in chemical engineering under the same OACD-paid arrangements as Mr. Eubanks, and has also received reimbursement for other course work from OACD. Mr. Plain also alleges that a white, Mr. James Norman, was hired at a higher within-in-grade at the same time that Mr. Plain was hired. However, this treatment was explained by Mr. Norman's much higher grades in school.

Mr. Plain also complained that his progression to SD-3 was slower than it should have been due to problems with his supervisor, Dr. Yong K. Kim, an oriental. It should be noted that plaintiffs' claims appear to be centered upon the "unfettered discretion of the white supervisors at OACD," and, therefore, Mr. Plain's problems with his oriental supervisor should not be addressed. On the other hand, Mr. Plain's complaints appear to be quite trivial; he complains that at times on his service reviews he should have been rated outstanding instead of better than average or fully adequate.

Mr. Johnny Smith is another class member who testified at the trial. He was an SD-2 research chemist in the research branch in Chemical Development at the time of trial. The reclassification of his position to SD-3 was in process. Mr. Smith has a B.S. degree in chemistry from Alcorn A & M University, and was in the midst of a Ph.D. program at V.P.I. when he came to work for OACD in June 1976 as an SD-1 research chemist. When he left V.P.I., he had completed enough course work to qualify for an M.S. degree but failed to write a thesis. According to Mr. Davis, Chemical Development will work with Mr. Smith to enable him to obtain the M.S. degree from V.P.I. Most of Mr. Smith's testimony consisted of hearsay comments made by, or allegedly made by, James R. Lehr, the head of Mr. Smith's section. The court fails to give credence to the garbled accusations made by Mr. Smith. Testimony from Mr. Lehr and Marilyn Taylor, TVA's director of personnel, and a black woman, puts the hearsay in its context and shows that Mr. Smith had not been singled out in a discriminatory fashion.

Mr. Earl Bailey is also a class member. He is an SE-5 agricultural aide in the soils and fertilizer research branch of the Division of Agricultural Development. He was the only witness from this division at OACD who testified for plaintiffs. He has a B.S. degree in biology from the University of North Alabama.

Mr. Bailey's complaint appears to have been resolved through the EEO complaint resolution process. Mr. Bailey works in the greenhouses. Prior to 1978 there were two white, longtime SE-5's who worked with him and were approaching retirement age. OACD personnel officers had concluded that due to some changes in higher levels of supervision at the greenhouses, the SE-5 position could not be justified by the level of work, and planned to abolish the positions after the incumbents retired. Mr. Bailey had formed the expectation prior to this time that his position would be reclassified to SE-5 when the incumbents retired. Upon learning that his position would not be so classified, he instituted an administrative EEO complaint. After an investigation the complaint was resolved and Mr. Bailey received an SE-5 classification and back pay, with the understanding that the SE-5 position would not necessarily be filled at that level once Mr. Bailey vacated

it. It appears that both sides acted in good faith. The court also notes that Mr. Bailey, while an SE–4, turned down an offer of an SE–5 at the greenhouses at TVA's Brown's Ferry Nuclear Plant near Athens, Alabama, for financial reasons which seemed important to him.

Mr. John Holmes, a class member, was an SD–2 analytical chemist in the analytical research laboratory in the engineering services branch of Chemical Development at the time of trial. Mr. Holmes has a B.S. degree in chemistry from Alabama A & M University; his chemistry curriculum is not accredited by the American Chemical Society. Mr. Holmes has chosen not to pursue additional studies in his field, but is working on an M.B.A. degree from the University of North Alabama, which is being paid for by OACD.

Mr. Holmes' allegations involve his position in a prior quality control lab, where he was employed as an SE schedule chemical laboratory analyst. After voicing some concern about advancement opportunities in this lab, he was given a lateral transfer to the analytical research laboratory, where he currently works. His immediate supervisor in the prior lab was black. The smaller lab where he worked prior to the transfer was staffed entirely by blacks. However, the court notes that Mr. Clark worked in a similar small quality control lab, which was staffed by whites except for him, and they were also on the SE schedule. Thus the advancement opportunities in this lab were connected to its size and work, and not the race of the staff.

Mr. Holmes' demonstration of interest and ability has been recognized by management, and has led to his transfer into an area with more scope, both in terms of size and level of work. This transfer has apparently assisted his progression upward.

The court received a great deal of evidence concerning the claim of Ms. Ruby Goodloe. Ms. Goodloe started working at OACD in 1974 on a part-time basis, while she was a full-time chemistry student at the University of North Alabama. Ms. Goodloe graduated from the University of North Alabama in December of 1977 and came to work in the fundamental research branch as an SD–1 research chemist in early 1978. She later progressed to an SD–2 analytical chemist. She resigned from OACD in April 1980.

Ms. Goodloe testified to a long story of her problems with supervisors from early in her career until its end. She ascribes all these problems to discrimination on the basis of her race. The principal portion of her testimony involved Robin M. Scheib, who is currently an M–5 research chemist in charge of the scanning electron microscope (SEM) laboratory. The testimony concerning Mr. Scheib involves Ms. Goodloe's work for him as both a part-time SE schedule employee and as an SD chemist.

Ms. Goodloe first alleges an allegation of discrimination near the end of her part-time employment. She claims that Mr. Scheib and Dr. Stephen K. Seale gave her an assignment as a "test" to determine what within-grade step she would receive as an SD–1. However, Mr. Scheib claims that the assignment was a useful examination of some sample preparation methods. The court finds that Ms. Goodloe's within-grade step at SD–1 had nothing to do with her performance of this assignment.

Ms. Goodloe claims that other white employees were exposed to more jobs and that she was left to train white employees in darkroom procedures in the SEM lab after which they would move on to other things. There is no evidence to support her claims. Ms. Goodloe was always assigned the more complex and demanding darkroom work and production of finished prints and layouts.

Ms. Goodloe complains that Mr. Scheib criticized her more harshly than her fellow white employees. However, Mr. Scheib claims that he would become impatient with Ms. Goodloe because she persisted in making the same mistakes after she had been initially corrected.

Ms. Goodloe claims she was not adequately trained on the equipment in the SEM lab, was not allowed to go to training school,

and instead was sent to a seminar which she felt was unhelpful to her, due to her lack of experience with the SEM. Mr. Scheib testifies that Ms. Goodloe received the same training on the SEM that he had had, that she was not sent to the school because she had already been taught the methods the school taught, and that she was sent to the SEM seminar to be exposed to methods of analyzing coal samples, of which Mr. Scheib expected an increase due to the operation of the new "ammonia from coal" plant at OACD. Ms. Goodloe left the SEM seminar early. She claims that her bed was uncomfortable; Mr. Scheib testified that she told him that she was homesick. Regardless, she left the seminar before the session on coal samples.

Ms. Goodloe claims that Mr. Scheib harassed her with problems concerning her time sheets while she was a part-time employee, by calling her out of coffee breaks for no reason, and by failing to allow her study time on the job, unlike other white employees. The court finds that these allegations were unsupported by the testimony at the trial.

Ms. Goodloe's service reviews from Mr. Scheib were also a point of allegation at the trial. Ms. Goodloe's disagreements with Mr. Scheib's assessments were brought before the EEO counselor. Although Mr. Scheib felt that his review accurately reflected her performance, he agreed to upgrade her review on the points of contention, and the matter was resolved. Her service review by Mr. Scheib was also a point of contention upon Ms. Goodloe's transfer to Dr. Ray Gremillion's supervision in May 1979. Again, Ms. Goodloe went to the EEO counselor. Once again, Mr. Scheib upgraded her review on several points, motivated apparently by the spirit of compromise.

The transfer to Dr. Gremillion's supervision is also an issue. The work at the SEM lab had not expanded in the expected fashion, and Dr. Gremillion needed help. His assistant, Suzanne Hunter, had been shifted into a new assignment with Dr. Seale, more in keeping with her skills. Mr. Lehr and Dr. Seale had two slots to fill: one was with Dr. Gremillion, a position of considerable potential for upward movement; the other position was with Wendell Wilhide, to assist him in operating a piece of analytical equipment called the XRF. Mr. Lehr and Dr. Seale decided to place Doris Ash, now an SD–1, after completing her B.S. degree in chemistry at the University of North Alabama, with Mr. Wilhide, and to give the position under Dr. Gremillion to Ms. Goodloe, in order to utilize her total work experience, especially her background with the SEM, which would be helpful in Dr. Gremillion's work. Ms. Ash had worked for Mr. Wilhide on a part-time basis while she was a student at the University of North Alabama. However, Ms. Goodloe had applied for the job with Mr. Wilhide.

Ms. Goodloe was of the opinion that the position with Dr. Gremillion had no future. This opinion was based on an earlier attempt by Dr. Gremillion to reclassify the position when Mrs. Hunter had it. Ms. Goodloe was informed of the unknown potential of the XRF position with Mr. Wilhide. The black employees branch protested her transfer, and Dr. Seale settled the matter by letting her have her choice of the two jobs. She chose the position with Mr. Wilhide on the XRF.

From her testimony before the court, it appears that the XRF was not the best choice for Ms. Goodloe. The XRF machine was relatively new to OACD. Much of Ms. Goodloe's time with the XRF was spent on the critical work of sample preparation in what was called the grinding room. Mr. Wilhide gave a detailed description of the procedures and emphasized the importance of producing a homogeneous sample for analysis by the XRF. It is clear to the court that Ms. Goodloe's work during this period was not exciting, but it was vital to the proper utilization of the XRF and served as an appropriate background to her understanding and training on the equipment. The court specifically rejects Ms. Goodloe's allegations concerning Mr. Wilhide's behavior during this period. Ms. Goodloe alleges that Mr. Wilhide was pres-

suring her to produce more by moving some of the sample preparation equipment closer together and by keeping a close eye on his watch when she was working. As Mr. Wilhide testified, he moved some equipment around due to his concern to save Ms. Goodloe a few steps while carrying a heavy load. He also had a habit of looking at his watch while he was away from the XRF because of the equipment's time cycle. Although Ms. Goodloe alleges some problems with her informal service review from Mr. Wilhide, Mr. Wilhide indicated on the review that there were no problems with her work. It was obvious that Mr. Wilhide was satisfied with her work and told her so.

As with the SEM, the question of training came up in the context of the XRF. Ms. Goodloe alleges a lack of training and an assignment beneath her professional status, due to discrimination because of her race. This claim is unfounded. She was given some exposure to the XRF and provided with some background training materials on the principles used by the XRF in the fall of 1979. She was sent to the school run by the vendor of the XRF to learn how to use it. She was given full permission to operate the XRF as much as she desired while Mr. Wilhide was on leave in late 1979, an opportunity of which she did not take advantage. After he returned from his leave, Mr. Wilhide was told by Ms. Goodloe that she had not run the XRF. He concluded that he should not pressure her into operating the equipment, and started giving her more experience on the XRF only after she asked for it, close to the time of her resignation.

Upon her resignation, the State of Alabama rejected her claim for unemployment compensation by stating that: "The claimant did voluntarily leave her most recent bona fide work with [TVA] and she did so in order that she might relocate to be with her husband who is employed in Chicago, Illinois. This is an excellent personal cause for leaving but does not constitute good cause connected with work for leaving." Ms. Goodloe had claimed that her resignation was due to the adverse racial climate on her job.

Ms. Goodloe's problems with her supervisors appear to the court to be due to her failure to adequately communicate her feelings to her supervisors. It appears that she did not take criticism well and often repeated mistakes after correction. Thus the court finds that her individual behavior and reactions created her problems, not her race.

Defendants introduced labor market analyses of the various schedules at OACD, comparing the black representation on these schedules with the percentage of blacks with the appropriate qualifications in the labor market. Defendants introduced such statistical data for the years 1972, 1975 and 1979. In all three years for the schedules remaining in this action, the percentage of blacks in the labor force at OACD was higher than the percentage of blacks in the relevant labor market.

Furthermore, representation on certain schedules was even found to be significantly higher, more than two standard deviations, than the relevant labor market percentages. In 1972, black representation in the SB and SF schedules was significantly higher than in similar occupations in the labor force. In 1975, black representation on the SD and SF schedules was more than two standard deviations higher than the percentage of blacks in the relevant labor market. By 1979, the percentage of blacks at OACD on schedules SB, SD and SF was significantly above the relevant labor market percentages. As discussed further in this opinion, the court finds these comparisons to be relevant to the issues before this court. Although defendants used 1970 census data, it is the opinion of this court that these census figures are the most recent available numbers, and are the data provided by the Alabama Department of Industrial Relations for EEO compliance purposes. Because it is clear to this court that certain unskilled workers cannot be promoted to skilled positions, the court feels that these labor market statistics presented by the defendants are the most relevant statistical data presented to the court.

■ In addition, the defendants submitted evidence concerning promotions and reclassifications by a comparison of the amount of time blacks and whites spent in a job title, schedule, and grade before they were reclassified or promoted to a higher schedule and grade. The defendants' expert, Dr. Martin, prepared progression charts depicting promotions and reclassifications of individuals in each of these job titles, which showed the number of months the individuals spent in their schedule and grade before they were promoted or reclassified to the next schedule and grade. No comparisons were made unless there were blacks and whites in the same category. There were no statistically significant differences between blacks and whites in comparing the amount of time spent in a schedule and grade prior to promotion or reclassification and, in addition, no pattern of blacks having spent a longer time in schedule and grade prior to promotion or reclassification. Again, it should be reiterated that about 80 percent of the upward movement at OACD is by reclassification, normally within a job title. The remainder of the upward movement is by promotions connected with TVA's vacancy announcement system.

Plaintiffs' statistical proof involved primarily comparisons of the average salaries of blacks and whites at OACD. It should be noted, however, that plaintiffs produced no evidence that blacks in the same kind and level of work were paid any less than whites. These comparisons ignored important differences in skills, education, training, and experience, and this court finds that these salary data that do not take into consideration these differences are entitled to little or no weight, particularly in a scientific research organization such as OACD, which utilizes such varied skills and talents.

Plaintiffs' regression analyses also compare salaries of jobs requiring a wide range of skills, education, training, and experience. Once again, the variables selected by the plaintiffs for the regression analyses failed to adequately reflect job comparability. Plaintiffs' analyses can be given little weight in light of the many important variables excluded. Furthermore, the plaintiffs' data cannot be used to establish a prima facie case of either disparate treatment or disparate impact.

This case involves both disparate treatment and disparate impact claims.

■ In disparate treatment cases, the plaintiff must show proof of discriminatory animus or intent. *Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), sets forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Third, if the defendant carries this burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825.

■ To establish a prima facie case of disparate treatment, the plaintiff must show:

(1) that he belongs to a racial minority;

(2) that he applied and was qualified for a job for which the employer was seeking applicants;

(3) that, despite his qualifications, he was rejected; and

(4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973).

The court finds that plaintiffs have failed to prove a prima facie case of disparate treatment. The plaintiffs have failed to show the required racial animus for their claims, as required for recovery under a disparate treatment claim. The plaintiffs have failed to provide evidence to the court of a single example of a black who should have been promoted or reclassified upward and was not. Finally, the plaintiffs' statistical evidence fails to establish a prima facie case of disparate treatment.

Although neither set of statistical data aptly approaches the main question before the court, which is promotions, the labor market comparisons of the defendants are more appropriate than the statistical evidence presented by the plaintiffs.

■ Plaintiffs attempt to argue that the use of labor market comparisons is inappropriate in light of language in *Johnson v. Uncle Ben's, Inc.*, 628 F.2d 419 (5th Cir. 1980), which states:

[T]he district court must decide whether Uncle Ben's has rebutted or discredited plaintiff's prima facie showing that in promotions blacks are relegated to lower level jobs and are promoted at a significantly slower rate than whites. On this question, statistics comparing Uncle Ben's work force to the external labor market are irrelevant.

628 F.2d at 426. However, this language is inapplicable to the case before this court, as the plaintiffs have not proven that blacks are promoted at a significantly slower rate than whites; nor that they are relegated to lower level jobs, as the following discussion shows.

The plaintiffs' statistical evidence based on average salaries is biased on the low side for blacks due to the large number of blacks hired by TVA (as a result of aggressive affirmative action) in recent years at entry level salaries. In addition, the statistical evidence presented by the plaintiffs regarding the MSEO area[1] is totally irrelevant in determining whether there has been racial discrimination at OACD, a small and unrepresentative portion of TVA's activities in the MSEO area.

The Fourth Circuit has provided support for the court's use of the defendants' labor market comparison:

If special skills are required for the promotion jobs, the Commission [Equal Employment Opportunity Commission] must produce evidence of the number of qualified blacks in lower level positions at RSC. Defendant's SMSA [standard metropolitan statistical area] qualified market data does not indicate an available labor pool in promotion and transfer cases, but such evidence may nonetheless be relevant, as we indicated in *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976), in assessing defendant's compliance with the requirements of Title VII. Accordingly, proper regard must be given to RSC's qualified labor market statistics in the absence of evidence indicating the actual percentages of blacks in lower positions who possess the required qualifications.

*Equal Employment Opportunity v. Radiator Specialty*, 610 F.2d 178, 186–87 (4th Cir. 1979). Accordingly, this court gives credence to the labor market statistics of the defendants, in the absence of appropriate statistical data from the plaintiffs.

■ Plaintiffs have also alleged that the TVA personnel system, which is facially neutral, has a disparate impact on blacks. Plaintiffs claim that the supervisory force, which is predominantly white, has "total unfettered discretion" in making decisions concerning blacks at OACD, and this "total unfettered discretion" is a particularized employment practice to be tested under the disparate impact analysis of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Under *Griggs*, if a plaintiff shows that a particularized employment requirement has discriminatory effect, defendants must then show the re-

---

1. The "MSEO" area is defined by plaintiffs' counsel, for the purposes of this case, as the TVA facilities served by the Muscle Shoals Employment Office that are south of the Tennessee border.

quirement has business necessity. The law does not support the proposed legal theory of the plaintiffs. They have failed to establish a prima facie case.

A proper appraisal of this discriminatory impact claim requires an analysis of the personnel system, which in turn requires a finding that there is no discriminatory impact of the standards or of their application to the class. *Griggs v. Duke Power Co.,* *supra.*

As discussed earlier, TVA has a system of formal written standards and statutory and nonstatutory controls governing personnel actions at OACD. There are three review systems for an aggrieved employee: (1) appeal through the personnel system, (2) the union grievance procedure, and (3) the EEO procedure. An employee may actually use all three review systems. The employment situation at OACD is thus different from that in *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972), where it was an absolute requirement for employees to obtain their immediate foreman's recommendation before they could be promoted, and there were no formal written standards for the foremen to apply.

The formal written job descriptions at OACD provide an objective, reviewable description of the duties and responsibilities of the position. Very few examples of apparently personalized job descriptions were found by the plaintiffs after exhaustive discovery. The discovery of a mere handful of such examples among thousands of job descriptions proves that, for all practical purposes, TVA's job description system is and has been objective. Neither has a single case been shown of an abuse of either of the three review systems in use or of failure of any of the three to function fairly and as intended.

It is interesting to note that plaintiffs never contended that their job descriptions or those of the class were subjective or discriminatory or unlawful in their pretrial contentions, even though these job descriptions are the keystone of the TVA personnel system. Furthermore, the plaintiffs' expert witness, Dr. Ireland, never discussed the job descriptions.

Plaintiffs' claim regarding a subjective "good old boy" network to fill management and supervisory positions is an attempt to create a class claim based upon discriminatory treatment in promotion to top management positions, without having to prove the requisite discriminatory animus, which proof does not exist in the record. Moreover, as stated earlier, promotions to the M schedule are not a part of this case. (*See,* orders of October 31, 1979, and July 8, 1980, as amended on July 10, 1980.)

Eighty-three percent (83%) of the promotions at OACD are brought about by reclassification. It is difficult for the court to overlook the conflict of interest created by the plaintiffs' contention that TVA's employee preference policy is evidence of discrimination, since the class is composed of TVA employees who necessarily benefit from the policy they attack.

The court also notes that subjectivity itself is not against the law; a subjective reason for a personnel action that does not hide discrimination satisfies an employer's burden. *See, Wilkins v. University of Houston,* 654 F.2d 388 at 400 (5th Cir. 1981); *Ramirez v. Hofheinz,* 619 F.2d 442, 446 (5th Cir. 1980). *Bay v. Goodyear Tire and Rubber Co.,* 23 EPD ¶ 30,903 at 15,674 (S.D.Tex. 1980), states:

> Subjective reasons for the failure to promote Plaintiffs should be given consideration in rebutting their charges of discrimination, for courts recognize that employment decisions often cannot realistically be made on the basis of objective standards alone. *Id.* An employer's decision may properly be based on subjective factors.

Most importantly, this Court must consider the result of Goodyear's promotional practices. Regardless of whether objective or subjective factors were utilized, did they result in an adverse treatment or impact upon Black employees? The answer here is "no." Accordingly, the mere presence of subjective procedures in the promotional process is not discriminatory. *Jenkins v. Caddo-Bossier Assn. for Re-*

*tarded Children*, 570 F.2d 1227 (5th Cir. 1978).

(Citations omitted). Again, it should be pointed out that no satisfactory proof was ever offered to the court that any particular black should have been promoted and was not (or was otherwise mistreated in a manner within the issues herein). If plaintiffs have a class claim, surely they can find *one good example* of discriminatory mistreatment of a black employee. *See, Wilkins v. University of Houston*, at 400–01 (5th Cir. Aug. 28, 1981). Thus, plaintiffs have not met their burden of proof to show that it is the standard operating procedure of OACD managers to treat blacks differently and unfavorably in promotions, reclassifications, training, work assignments, and reduction in force, on account of their race.

■ Plaintiffs attempt to prevail by alleging that white TVA managers make subjective decisions, especially in the handling of work assignments that might lead to faster professional development. In order for the court to find for the plaintiffs on this rationale, the court would have to "establish a presumption that left to their own devices whites will, at least unconsciously, discriminate against blacks." *Grant v. Bethlehem Steel Corp.*, 22 FEP Cases 687, 689 (S.D.N.Y.1978).

This presumption is not the law; in fact, plaintiffs' present chief counsel established such in *Grant*.

In assessing the statistical evidence, the Supreme Court has dictated that plaintiffs cannot carry their burden of proof by use of statistics unless their statistics are both relevant to their contentions and account for no reasonable interpretations other than the conclusion they seek to draw. *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582–87, 99 S.Ct. 1355, 1364–66, 59 L.Ed.2d 587, 600–604 (1979). As discussed *infra*, the average salary statistics presented by plaintiffs are lower for blacks than for whites due to the disproportionately large number of blacks hired (through affirmative action) in recent years at entry-level salaries to increase the number of black employees at TVA. Evidence was

presented to the court that TVA was quite aware of and sensitive to the desirability of an aggressive affirmative action program. Regardless, defendants have aptly pointed out to the court that according to the plaintiffs' proof of average salaries over the relevant time period, on or after January 17, 1973, the average salary of blacks at OACD has increased by 88.2 percent, while the average salary of whites has increased by 54.5 percent.

In conclusion, because plaintiffs have failed to provide evidence to the court of a prima facie case of disparate treatment or disparate impact, or even an example of a single black who should have been promoted and was not, much less appropriate statistical data on the pool of qualified blacks that could be promoted, this court finds for the defendants.

An order consistent with this memorandum opinion will be entered contemporaneously herewith.